UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

DALE ROCK,                          )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        CIVIL NO.  3:14cv1715
CAROLYN COLVIN, Acting              )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social

Security Act.  42 U.S.C. §416(I); 42 U.S.C. §423; 42 U.S.C. §§ 1382, 1382c(a)(3).  Section

205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a

certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based.  The court shall have the power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques."  42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an

impairment exists.  It must be shown that the impairment is severe enough to preclude the

plaintiff from engaging in substantial gainful activity.  Gotshaw v. Ribicoff, 307 F.2d 840 (7th

Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill.

1979).  It is well established that the burden of proving entitlement to disability insurance

benefits is on the plaintiff.  See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v.

Cohen, 425 F.2d 20 (7th Cir. 1970).

　　　　Given the foregoing framework, "[t]he question before [this court] is whether the record

as a whole contains substantial evidence to support the [Commissioner's] findings."  Garfield v.

Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786

(7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting

Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger,

552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed,

42 U.S.C. §405(g), unless there has been an error of law."  Garfield, supra at 607; see also

Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

　　　　In the present matter, after consideration of the entire record, the Administrative Law

Judge ("ALJ") made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.     The claimant engaged in substantial gainful activity during the following periods: Third Quarter of 2011 (20 CFR 404.1520(b), 20 CFR 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*).

3.     However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.     The claimant has the following severe impairments: cognitive disorder NOS, diabetes mellitus, obesity, and depression (20 CFR 404.1520(c) and 416.920(c)).

5.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes or scaffolds and must avoid even moderate exposure to extreme heat and cold, wetness, and humidity. He must avoid even moderate exposure to environmental irritants, such as fumes, odors, dusts or gases, and he is prohibited from jobs that require driving as a function of the job. He must avoid even moderate exposure to hazards, such as unprotected heights or dangerous moving machinery. The claimant is able to understand, remember, and carry out simple instructions; able to make judgments on simple work-related decisions; and able to respond to usual work situations and to changes in a routine work setting. He requires work that can be performed at a flexible pace. He can perform work around coworkers throughout the day, but only with occasional interaction with coworkers.

7.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.     The claimant was born on February 12, 1960 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.     The claimant has at least a high school education and is able to communicate in

English (20 CFR 404.1564 and 416.964).

10.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from January 16, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 23-33).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on January 9, 2015. On April 16, 2015, the defendant filed a memorandum in support of the Commissioner's decision, and on May 28, 2015, Plaintiff filed his reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her

> former occupation?  (5)  Is the claimant unable to perform any other
> work within the economy?  An affirmative answer leads either to
> the next step or, on steps 3 and 5, to a finding that the claimant is
> disabled.  A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).  From the nature

of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff filed an application for Disability Insurance Benefits ("DIB") and Supplemental

Social Security ("SSI") on December 30, 2011, alleging a disability onset date of January 16,

2011.  The Disability Determination Bureau (DDB) denied the Plaintiff's claims on February 7,

2012. He requested reconsideration, but his claims were denied again on June 6, 2012. Plaintiff

filed a request for an administrative hearing on June 25, 2012. On March 13, 2013, Plaintiff

appeared in Valparaiso, Indiana before ALJ Mario G. Silva of the Valparaiso, Indiana Office of

Disability Adjudication and Review (ODAR). On April 24, 2013, ALJ Silva  issued an

unfavorable decision. Id.  Plaintiff filed a request for review by the Appeals Council of the Office

of Disability Adjudication and Review which declined to review his decision on May 9, 2014.

The Plaintiff was born on February 12, 1960. (R. at 31). The Plaintiff meets the insured

status requirements of the Social Security Act through December 31, 2015. (R. at 23). Plaintiff

completed high school. (R. at 177). He has previously worked as an assistant pressman, coach,

fence builder, livestock handler, stockboy, and driller. (R. at 208).

The Plaintiff was seen by Dr. Maureen A. Neeley at Woodlawn Medical Professionals on

May 14, 2010 with complaints of sinus pain. (R. at 330). The Plaintiff also stated that he had

stopped taking Plavix a few months prior to the appointment because he could no longer afford the medication. *Id.* Upon physical examination, the practitioner noted "[s]ome intermittent Right eye blurriness lasts about 5 minutes then passes" and that the "Left eye has had diminished central vision since TIA 5 yrs ago." *Id.* The claimant's gait was reported to be "slow and cautious" and his speech was slow. (R. at 330-331). Dr. Neeley opined that the claimant "really needs a good follow up appt with a neurologist for the vision changes and headaches" and refilled Plavix and Lisinopril medications. (R. at 331)

On January 17, 2011, the Plaintiff presented to the Akron Medical Center with complaints of sudden onset muscle weakness on his right more so than the left which resulted in difficulty speaking and walking. (R. at 298). Physical examination by the physician revealed that the claimant had reduced muscle strength in his right upper and right lower extremities while his left upper and lower extremities had normal muscle strength. (R. at 299). The physician admitted Plaintiff to Woodlawn Hospital "for possible developing stroke." *Id.*

While admitted at Woodlawn Hospital, the Plaintiff underwent an MRI of his brain on January 17, 2011 and an echocardiograph on January 18, 2011. (R. at 364 and 297). The MRI showed findings "compatible with small nonhemorrhagic infarct involving the left basal ganglia region" and a "[c]hronic ischemic type change…in the perivertebral deep white matter…[that is] compatible with changes from a remote infarct in this area." (R. at 364). The echocardiograph revealed a visually estimated ejection fraction of 50 to 55 percent, mildly dilated left atrium, mild to moderate aortic regurgitation, "diffuse thickening of the aortic valve cusps without reduced excursion," and mildly increased left ventricular cavity size. (R. at 297). Plaintiff was treated with a Heparin drip during his in-patient stay and was diagnosed with a right basal ganglia stroke by

MRI. (R. at 348). Upon discharge, the Plaintiff was seen by Dr. Szabo Szabolcs on January 19, 2011 with complaints of right-sided weakness and difficulty with speech. (R. at 292). Upon physical examination, Dr. Szabolcs noted that the Plaintiff's speech was "slightly slow" and that his "[m]ild right-sided weakness persists." (R. at 293). The specialist stated that the electrocardiogram taken just previously showed "sinus rhythm, perhaps borderline left atrial enlargement" as well as a "first degree AV block." *Id.* The physician stated that "Mr. Rock has had second ischemic insult, both involving the deep white matter, suggesting more small vessel disease." (R. at 294). Dr. Szabolcs further opined that the Plaintiff should have some more formal neurology evaluations completed and recommended cessation of tobacco use. *Id.* The Plaintiff was discharged on January 19, 2011 from Woodlawn Hospital into the care of Dr. Szabolcs for an outpatient transesophageal echocardiogram. (R. at 348).

The Plaintiff reported to the optometrist office of Dr. Thomas O. Troutman on March 17, 2011 with complaints of vision loss in his left eye. (R. at 384-387). Dr. Troutman opined that the Plaintiff had "moderate loss of visual function…in the [Plaintiff's] left eye." (R. at 384).

The Plaintiff presented to the medical office of Dr. Richard Kennedy on April 27, 2011 to follow up on his history of stroke. (R. at 318). The Plaintiff complained of recent slurred speech and wished to discuss taking Chantix to aid in tobacco cessation. *Id.* The doctor noted that the Plaintiff presented with fatigue but was otherwise unremarkable. *Id.* The physician prescribed Chantix to help the Plaintiff quit smoking and ordered a lipid panel. (R. at 319).

The Plaintiff returned to Dr. Neeley to assess his neurological symptoms on October 26, 2011. (R. at 310). The Plaintiff gave an account of his confusion by recounting that he had gone outside without his shoes earlier that morning and that he had driven the wrong direction. *Id.* The

practitioner reported that the Plaintiff had fatigue, decreased memory, difficulty speaking, and focal neurological symptoms. *Id.* Dr. Neeley remarked that the Plaintiff's mental status was drowsy and that he generally appeared lethargic and slow. *Id.* Upon physical examination, the practitioner noted rales in the right lung field, apathetic affect, slow speech, concentration impairment, and short term memory impairment. *Id.* The physician ordered a follow up examination to track neurological symptoms and diagnosed bronchitis. (R. at 311).

Plaintiff then underwent an MRI of his brain at Woodlawn Hospital to find the cause of his recent personality change and an x-ray of his chest to determine what is causing his chest pain. (R. at 273-274). The MRI showed "[n]othing…to suggest cause of [Dale's] personality change" but did reveal a "[s]table, remote right basal ganglion/centrum semiovale hemorrhagic encephalomalacia." (R. at 273). The x-ray of the Plaintiff's chest revealed "[m]inimal subsegmental atelectasis or scarring in the right middle lobe." (R. at 274).

The Plaintiff followed up with Dr. Neeley on October 28, 2011 with complaints of continued speech difficulty and personality changes. (R. at 308). Plaintiff also complained of decreased memory, focal neurological symptoms, anxiety, and inability to concentrate. *Id.* Upon physical examination, the doctor noted that the Plaintiff's speech was slow, but had no other neurological impairments of note. *Id.* The Plaintiff was ordered to follow up with Dr. Neeley to track symptom progression. (R. at 309).

The Plaintiff reported to Woodlawn Hospital on October 31, 2011 for an EEG. (R. at 268). Although the EEG revealed "[n]o evidence of epileptiform or seizure activity, it did show "[m]ild excessive slowing" that "may represent mild diffuse cerebral encephalopathy." *Id.*

On November 11, 2011, the Plaintiff presented to the office of Dr. T.J. Curfman for a

neurologic consultation. (R. at 332). The specialist summed up the Plaintiff's complaints in the following:

> The current problems began just in the last few months. Family became concerned due to several instances where he would seem to be very confused or disoriented, would not talk with them or there would be long delays before he would respond…In one instance, he got in his truck and drove for quite some distance. His daughter was concerned and followed him and called him, and he could not explain why he was out just driving around.

*Id.* The Plaintiff reported that he has ongoing vision complaints in his left eye, "sleeps long hours but does not feel rested," and has "daytime hypersomnolence with a tendency to nap." (R. at 333). The physician noted that the Plaintiff's mental status "demonstrate[d] some psychomotor retardation or blunting of affect with poor eye contact, but at other times is smiling." *Id.* Further, the specialist stated that the Plaintiff's reflexes were "1-2+ asymmetric, being slightly more brisk on the left," and that he had a positive left Babinski sign. The doctor opined that "the recent behavioral change and confusional state may be manifestations of untreated obstructive sleep apnea." *Id.* The physician discontinued the Plaintiff's use of Coumadin and prescribed use of either Plavix or aspirin and Celexa. (R. at 333-334). The specialist recommended nocturnal polysomnogram testing if the Plaintiff's symptoms continued. (R. at 334).

On December 28, 2011, the Plaintiff underwent polysomnography testing at the sleep medicine office of Dr. Krishnan Rajagopal. (R. at 375). The testing revealed that the Plaintiff achieved no REM sleep during any sleep stage, had "[l]oud and at time ambiguous snoring …many causing arousals," "respiratory events noted with desaturation of SPO2," and the Plaintiff "scored 19/24 on the Epworth Sleepiness Scale" *Id.* The results of the testing evidenced the Plaintiff had obstructive sleep apnea, upper airway resistance syndrome, sleep related hypoxia,

repetitive intrusions of sleep, sleep stage dysfunctions, and snoring. *Id.* The specialist recommended the Plaintiff be evaluated for CPAP treatment or surgical intervention. (R. at 376). The Plaintiff followed up with Dr. Rajagopal for CPAP evaluation on January 10, 2012. (R. at 379). The specialist observed that the Plaintiff's conditions improved with use of the CPAP and recommended use of a nasal CPAP with re-evaluation in twelve months. (R. at 380).

On December 30, 2011, the Plaintiff had a face-to-face interview to file for disability with S. Skrivan. (R. at 173-174). The interviewer noted in the observations section:

> Claimant was nice and able to answer some questions. He had a very noticeable delay in his memory. He came into the office with his fiance's daughter. She answered a lot of the questions based on the information that her mom (NH's fiancé) had written down. He couldn't remember a lot of things.

(R. at 173). The interviewer noted that Plaintiff had difficulty with both concentration and answering questions in the interview. *Id.*

The Plaintiff reported to a mental status examination with Dr. John Heroldt ordered by the disability determination office on January 18, 2012. (R. at 389). The Plaintiff complained of having memory difficulties that include recalling names of individuals that he should know (including his own), remembering to take his daily medications, recalling recent conversations, no longer drives upon advice from a doctor, and remembering how to use the machine that he worked on in his previous employment. (R. at 390). The medical consultant noted that the Plaintiff was "able to attend to tasks, answer simple questions, and follow instructions without difficulty" at the time of the appointment. *Id.* However, the Plaintiff showed many problems in his Mental Status Examination. (R. at 390-391). The Plaintiff gave the date as January 17, 2012 when it really was January 18, 2012 after being told the date twenty minutes earlier and was

confused as to the current time. (R. at 390). Plaintiff "was able to repeat 4 digits forward and 3 digits backward…[and] was able to recall 0/4 words after eight minutes of elapsed time. (R. at 391). The Plaintiff's WMS-IV Test results:

> Fell between high average and Extremely Low. The claimant scored 65 on Auditory Memory, which falls in the Extremely Low range of functioning and is at the 1st percentile. He scored 110 on Visual Memory, which falls in the high average range of functioning and is at the 75th percentile. He scored 102 on Visual Working Memory, which falls in the Average range of functioning and is at the 55th percentile. He scored 87 on Immediate Memory, which falls in the Low Average range of functioning and is at the 19th percentile, and he scored 84 on Delayed Memory, which falls in the Low Average range of functioning and is at the 14th percentile. The claimant attained a Cumulative Percentage score of 26-50% on Logical Memory II Recognition, a Cumulative Percentage score of 3-9% Verbal Paired Associates II Recognition, a Cumulative Percentage score of >75% on Visual Reproductions II Copy. The claimant attained a scaled score of 12 on Designs I Content, a scaled score of 10 on Designs I Spatial, a scaled score of 13 on Designs II Content, and a scaled score of 10 on Designs II Spatial.

(R. at 391-392). Dr. Heroldt wrote:

> Scores on the WMS-IV indicate that the claimant's visual memory is functioning well. The scores also indicate that other areas have been affected negatively and may affect his adaptive functioning skills. By the claimant's report and that of his stepdaughter, the claimant is experiencing memory problems. The claimant has to be reminded to take his medication. He has difficulty recalling recent conversations and cannot recall words he wants to use in conversations. He experienced difficulty when working recalling how to use a machine he used to do his work. He forgets names of people he should know and has on occasion forgotten his own. He has had difficulty recalling the medical history of his family; information he once knew.

(R. at 392). The examining physician diagnosed an Axis I Cognitive Disorder, Axis III Undiagnosed episodes of confusion, Axis IV occupational problems, and gave an Axis V GAF score of 54. (R. at 392). The psychological consultant also felt "the claimant is not capable of handling his funds." *Id.*

On January 20, 2012, a Mental Residual Functional Capacity Assessment was performed

by Dr. Benetta E. Johnson. (R. at 397-400). The reviewing doctor only gave moderate limitations in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to maintain attention and concentration for extended periods. (R. at 397-398). All other categories were marked "Not Significantly Limited." *Id.* In explaining these determinations, the medical consultant noted that the Plaintiff had a "very noticeable delay in his memory, He couldn't remember a lot of things…can go out alone, goes out daily, shops, counts change, hobbies-tv, sporting events, spends time with others, get along with others, attention span-very little, can't finish what's started." (R. at 399). However, the examiner continues by opining that the:

> Clmts rpt appears partially credible, info in file does not fully support ct allegation. Clmt nts physical. The evidence suggest that the claimant can understand, remember, and carry-out simple tasks. The claimant can relate on at least a superficial basis. The claimant can attend to task for sufficient periods of time to complete simple tasks. The claimant can manage light stresses involved in work related tasks. Claimant can manage unskilled tasks.

*Id.* A psychiatric review technique was also completed the same day, January 20, 2012, by Dr. Johnson. (R. at 401-413). Dr. Johnson noted that the Plaintiff had a Cognitive Disorder that mildly limits the Plaintiff's activities of daily living and difficulties in maintaining social functioning, moderately limits the Plaintiff's ability to maintain concentration, persistence, or pace, and has no episodes of decompensation of extended duration. (R. at 402 and 411).

On February 2, 2012, a Physical Residual Functional Capacity Assessment was performed by Dr. M. Ruiz. (R. at 415-422). The medical consultant gave the Plaintiff the exertional limitations of lifting and/or carrying twenty pounds occasionally and ten pounds frequently, standing and/or walking about six hours in an eight hour workday, sit with normal breaks about

six hours in an eight hour workday, and unlimited pushing and/or pulling. (R. at 416). Dr. Ruiz also gave the Plaintiff the postural limitations of never climbing ladders, ropes, or scaffolds, and frequent ability to climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. (R. at 417). The examiner gave no manipulative, communicative, or visual limitations. (R. at 418-419). The Plaintiff was also given the environmental limitations of avoiding concentrated exposure to extreme cold, extreme heat, wetness, humidity, and fumes/odors/dusts/gases/poor ventilation but unlimited exposure to noise, vibrations, and hazards. (R. at 419). The examiner stated that the severity of the Plaintiff's symptoms were "partially credible" and that the "alleged severity of symptoms [was] not fully supported by the MER." (R. at 420). The medical evidence the examiner gave to support his findings were that of the "1/11 MRI brain…1/11 Echo…10/11 MRI brain…10/11 EEG…11/11 Neuro consult for confusion & change in personality…1/12 PSG: OSA improved with CPAP." (R. at 416-417). This assessment was affirmed by Dr. F. Kladder and Dr. Mangala Hasanadka, on May 31, 2012. (R. at 454-455).

On March 21, 2012, the Plaintiff returned to see Dr. Neeley to follow up with his excessive daytime sleepiness and snoring. (R. at 452). The physician gave a written order to Plaintiff for a CPAP machine with heated humidification. *Id.* The Plaintiff presented to the medical office of Dr. Christopher Ricketts on May 30, 2012 to discuss his "recurrent strokes and disability." (R. at 450). The Plaintiff reported he was no longer "on CPAP due to cost." *Id.* The treating physician noted that the Plaintiff "Lost a job due to stroke sx which was in November. Family hasn't let him drive. Personality is 'flatter affect since his episode in November." *Id*. He diagnosed "SYMPTOM, ALTERATION OF AWARENESS, TRANSIENT." (R. at 451). From September 25, 2012 to March 6, 2013, the Plaintiff continued to see Dr. Ricketts for check ups

and treatment for "Transient alteration of awareness." (R. at 478-484, 491-493). On March 6, 2013, Dr. Rickets stated that the Plaintiff "has his disability hearing next week so hopefully this goes favorably for him." (R. at 493).

On March 13, 2013, Plaintiff appeared for a hearing in Valparaiso, Indiana before ALJ Mario G. Silva of the Valparaiso, Indiana Office of Disability Adjudication and Review (ODAR). (R. at 39-65). The Plaintiff's attorney, Ms. Nancy Green, represented the Plaintiff at the hearing. (R. at 42). Ms. Green reported that the Plaintiff's severe impairments included symptoms from two strokes (one in 2005 and another in January of 2011), small vessel disease, memory issues, transient alteration of awareness, hyper-somnolence, obstructive sleep apnea, and diabetes myelitis. *Id.* The Plaintiff claimed an onset date of disability of January 16, 2011. *Id.*

The Plaintiff was asked by ALJ Silva why he was incapable of working any further, to which he responded that he cannot drive anymore to get to work and back. (R. at 43). Plainitff testified that he had asked his doctor a year previously about driving and that the doctor "just thought it was a good idea if [Mr. Rock] just didn't for a while because basically [Mr. Rock's] unsteadiness or [his] thought process wasn't good enough to" drive. (R. at 44). The Plaintiff recounted an incident with driving:

> Tiffany got me up one morning, and wanted me to follow her someplace, and I went out and got in the truck, and just headed to where I thought she was going, and she came to let me know that that's not where she was going, and we went back to the house, and I went back to bed.

(R. at 51). The Plaintiff further stated that he also has "a hard time remembering little tasks to do on a repetitive basis." (R. at 43-44).

ALJ Silva asked the Plaintiff about his previous work. (R. at 44). Plaintiff first described

14

his employment as an assistant pressman, stating that he was required to lift up to "70, 75 pounds." (R. at 44-45). The Plaintiff then described his employment as a stockboy in a hardware store, testifying that the job "was a constant lift…from one thing to another, and 50-pound bags of feed were pretty common." (R. at 45). After that employment, the Plaintiff described a self-employed job putting up agricultural fences that required him to "load and unload all…materials, and…setting posts, posts are anywhere from probably 20 pounds to 50 pounds." *Id.* The Plaintiff further remarked that his self employment "work was full-time, [but] the wages really weren't." *Id.* Plaintiff stated that he was terminated from his most recent employment in 2011 as a machine operator and was not given a reason for the termination. (R. at 47). He further explained that he "hit a stretch there where [he] felt really fuddled, and it was about a week after that they just called and said stay home." *Id.* The Plaintiff explained that at this job he worked on a CNC machine and "once it was set up, there really wasn't any programming to do it…just ran on its own." (R. at 60). He said that he would lift around twenty pounds three or four times a night. *Id.*

The Plaintiff explained that the machine operator employment caused him to be "totally flipped out or something because [he] couldn't remember any of…how to start [the machine] back up" when it would go down. (R. at 48). The Plaintiff testified that if the machine went down, there were "five or six steps to get it running again" and he could not remember those steps. (R. at 52). Plaintiff stated that he was not having problems feeling fuddled currently because "typically I'm not in any position where I'm out of my comfort zone, so to speak I guess." (R. at 48). The Plaintiff stated that he lives with his fiancé and that his housework consists of "laundry some, but that's about it." *Id.* He stated that he still does some livestock work but that he has to have someone drive him to his friend's place to do chores and has someone "help [him] along" with

remembering what to do. (R. at 49). The Plaintiff described his normal day as: "Get up, go to the bathroom, take my medicine, and then set down and sleep in the easy chair in the living room, until lunch." (R. at 50). He stated that he has trouble with staying awake in the mornings and that he has found that his CPAP machine is not of great help with sleeping and no help in memory or concentration. *Id.* The Plaintiff testified that he watches TV during the day, but has trouble paying attention and remembering what he watched. (R. at 51). He stated that if he were to watch a football game that "I don't know if I could remember all of it, but I'd remember the outcome for a little while once it's over." *Id.* Plaintiff remarked that he cannot remember anything new. (R. at 52). The Plaintiff noted that his fiancé puts his medicines in a "nice little tray so I could just open up that day" and that he sometimes requires reminding to take his medications. (R. at 52-53). He stated that he "[p]robably need[s] to be reminded every five minutes or so, it seems like" to do things asked of him such as "feed the dog, mow the lawn, that sort of thing." (R. at 53).

ALJ Silva began to ask the Plaintiff about his physical abilities at the time of the hearing. (R. at 53). The ALJ asked the Plaintiff if he could pick up a three-month-old sheep, as that was the type of animal the Plaintiff took care of. *Id.* The Plaintiff responded that he is able to pick one up and they typically weigh between sixty and seventy pounds at most. (R. at 54). However, the Plaintiff stated that they "[m]ore herd them than anything" and that there is "[r]eally no lifting there at all." (R. at 59). Plaintiff stated that his fiancé's daughter helps him take care of his friend's 70 sheep three evenings of the week. (R. at 55). He further remarked that he does not receive any income from the work and does it to pass the time. *Id.* The Plaintiff noted that they spend "[p]robably a[n] hour, hour-and-a-half" doing the evening chores and that Tiffany, his fiancé's daughter, "helps me with the chores." *Id.* Plaintiff stated that he does not help out with

any other chores with the sheep other than birthing. *Id.*

The vocational expert testified that the Plaintiff's previous work included: stock clerk that was semi-skilled and medium or greater as performed but heavy as defined; hand packer that was unskilled and heavy as performed but medium as defined; print shop helper that was semi-skilled and medium or greater as performed but medium as defined; assistant press operator that was skilled and light as performed but medium as defined; livestock yard attendant that was unskilled and light as performed but heavy as defined; production machine tender that was semi-skilled and light as performed but medium as defined. (R. at 60-61). The vocational expert remarked that there are not any skills that would transfer to a sedentary exertional level. (R. at 62).

The first hypothetical that ALJ Silva put forth included:

> an individual capable of performing at the light exertional level as generally defined…[who is] to never climb ladders, ropes, or scaffolds…is to avoid even moderate exposure to extreme heat, cold, wetness, or to humidity…is to avoid even moderate exposure to environmental irritants…prohibited from jobs that require driving as a function of the job…is able to understand, remember, and carryout simple instructions…is able to make judgments on simple work-related decisions…is able to respond to usual work situations and to changes in a routine work-setting…requires work that can be performed at a flexible pace…work can be performed around coworkers throughout the day, but only with occasional interaction with coworkers.

(R. at 62). The vocational expert concluded that the Plaintiff's "past work would be eliminated …in its entirety." (R. at 63). The vocational expert concluded that other jobs exist that such a person could perform with the above limitations, including a marker, a mail clerk, and a routing clerk. *Id.* ALJ Silva posed a second hypothetical similar to the first with the addition that "the individual must avoid even moderate exposure to hazards, such as unprotected heights or dangerous, moving machinery." *Id.* The vocational expert testified that the above listed jobs could

still be performed with the added limitation. *Id.* The vocational expert further stated that the typical employer tolerance in unskilled occupations with respect to being off task at times other than scheduled breaks is "10 percent net of regularly scheduled breaks and lunch." *Id.* With respect to being absent from work in unskilled occupations, the vocational expert testified that "One day per month total, both excused and unexcused" is tolerated and that "arriving late, leaving early is kind of the same as an absence for unskilled work." (R. at 64).

The vocational expert was then asked how much retraining is permitted with an individual to keep the employment. (R. at 64). The vocational expert stated:

> In terms of ongoing training, and reminding somebody of a task already taught, and, and, the demonstrated competency, then it's pretty much the tolerance for retraining in that sort is pretty much nominal. I mean if you hadn't done something for several weeks or a month, you know, you might have to – the supervisor might have to briefly re-demonstrate it, but that would be about it. If it had to be done say, daily or even weekly, then I think you would not be able to perform – or retention would be an issue, and unskilled entry-level work.

(R. at 64-65). The vocational expert also agreed that unskilled, light jobs would need an individual to be able to learn the job within 30 days of training. (R. at 64).

On April 24, 2013, ALJ Silva issued an unfavorable decision. (R. at 17-38). At Step Two, the ALJ concluded that the Plaintiff suffers from the following severe impairments: cognitive disorder NOS, diabetes mellitus, obesity, and depression. (R. at 23-24). At Step Three, Plaintiff's impairment did not meet a Listing. At Step Four, the ALJ concluded the Plaintiff was unable to perform his past relevant work as a stock clerk, hand packager, print shop helper, assistant press operator, livestock yard attendant, or production machine tender. (R at 31). At Step Five, the ALJ found that the Plaintiff could perform the following occupations: routing clerk, marker, and mail clerk. (R. at 23). Plaintiff's claim for benefits was denied upon this Step Five finding. (R. at 23).

In support of remand or reversal, Plaintiff argues that the ALJ assessed a mental RFC that is not supported by substantial evidence and the relevant legal standards. In assigning a Residual Functional Capacity, the ALJ must consider the Plaintiff's testimony, the objective medical evidence, and opinions from medical sources. 20 C.F.R. § 404.1545(3). Generally, a court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004)). However, an ALJ does not possess unlimited discretion to reject a Plaintiff's testimony. When the credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a Plaintiff's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872. A court may reverse a credibility determination if it finds that the rationale provided is "unreasonable or unsupported." *Prochaska*, 454 F.3d at 738 (citing Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir.2006)). The Seventh Circuit has repeatedly held that an adjudicator must build a logical and accurate bridge between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir, 2009); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Plaintiff points out that he testified that he has suffered from profound cognitive difficulties since experiencing his second stroke in 2011. He even reported having "a hard time remembering little tasks to do on a repetitive basis." (R. at 43-44). Plaintiff stated that he still does some livestock work but that he has to have someone drive him as well as someone to "help me along" with remembering tasks. (R. at 49). The Plaintiff testified that he watches TV during the day, but has trouble paying attention and remembering what he watched. (R. at 51). He

explained that if he were to watch a football game that "I don't know if I could remember all of it, but I'd remember the outcome for a little while once it's over." *Id.* Plaintiff remarked that he cannot remember anything new that he has tried to learn since his stroke in January of 2011. (R. at 52). He stated that he "[p]robably need[s] to be reminded every five minutes or so, it seems like" to do things asked of him such as "feed the dog, mow the lawn, that sort of thing." (R. at 53). Plaintiff contends that the ALJ's rejection of his allegations is "patently wrong." Plaintiff claims that the ALJ failed to provide the requisite logical and accurate bridge between the evidence and his decision to reject Plaintiff's allegations of profound cognitive limitations.

The ALJ opined that "there is no objective explanation for [Plaintiff's] confusion that started in October 2011." (R. at 30). But this assertion is clearly erroneous and belied by the ALJ's own opinion which acknowledges such corroborative objective evidence. (R. at 27-28) In fact, the record shows that an MRI performed at the time of Plaintiff's January 2011 stroke produced findings "compatible with small nonhemorrhagic infarct involving the left basal ganglia region" and a "[c]hronic ischemic type change…in the perivertebral deep white matter…[that is] compatible with changes from a remote infarct in this area." (R. at 364). A treating physician subsequently stated that "Mr. Rock has had second ischemic insult, both involving the deep white matter, suggesting more small vessel disease."[5] (R. at 294). In October of 2011, when Plaintiff started experiencing confusion, Dr. Neeley remarked that the Plaintiff's mental status was drowsy and that he generally appeared lethargic and slow. *Id.* The physician further documented an apathetic affect, slow speech, concentration impairment, and short term memory impairment. *Id.* An MRI of Plaintiff's brain subsequently showed a "[s]table, remote right basal ganglion/centrum semiovale hemorrhagic encephalomalacia." (R. at 273). Although the EEG revealed "[n]o

evidence of epileptiform or seizure activity," it did show "[m]ild excessive slowing" that "may represent mild diffuse cerebral encephalopathy." *Id.*

The ALJ, however, emphasized that the EEG did not show any evidence of seizures. (R. at 28). Plaintiff argues that this lack of documentation for seizure activity, which he does not experience and never alleged experiencing, does not undermine his allegations of profound cognitive and memory deficits which the test did in fact corroborate by suggesting encephalopathy. The ALJ acknowledged the corroborative clinical evidence of "psychomotor retardation or blunting of affect with poor eye contact" as well as testing showing Plaintiff "fell in the extremely low range of functioning at the 1st percentile" with auditory memory. (R. at 28). Plaintiff concludes that because the ALJ erroneously determined that there is no objective evidence supporting Plaintiff's allegations of profound cognitive difficulties, the ALJ's adverse credibility determination is "patently wrong." This court agrees with the Plaintiff on this point.

Plaintiff also argues that the ALJ improperly rejected Plaintiff's allegations by invoking his ability to perform limited daily activities. (R. at 25: "[t]he undersigned notes that the claimant is able to watch television, remember a football game, do laundry, mow the lawn, and help care for 70 sheep, all of which require a significant amount of concentration, persistence or pace,"; R. at 29, 30: "Despite his allegation of cognitive difficulties and depression, he is able to take care of his personal needs, do household chores, and help care for livestock."). However, the ALJ mischaracterized the Plaintiff's testimony by omitting Plaintiff's explanation that he has someone "help [him] along" with remembering what to do while caring for livestock. (R. at 49). And the Plaintiff actually testified that he could watch an entire football game but "I don't know if I could remember all of it, but I'd remember the outcome for a little while once it's over." *Id.* He also

testified that he "[p]robably need[s] to be reminded every five minutes or so, it seems like" to do

things asked of him such as "feed the dog, mow the lawn, that sort of thing." (R. at 53).

Plaintiff argues that his ability to perform limited daily activities with extensive prompting

and reminders does not reasonably show that he can sustain the mental demands of simple work

without prompting or reminders. Plaintiff correctly contends that the ALJ was not permitted to

cherry-pick Plaintiff's testimony, cite his ability to perform such activities, and ignore his need

for extensive support to be able to complete them due to his profound cognitive deficits. *Denton*

*v. Astrue*, 596, F.3d 419, 425 (7th Cir. 2010) (ALJ cannot "cherry-pick facts that support a finding

of non-disability while ignoring evidence that points to a disability finding"). Moreover, the

Seventh Circuit has repeatedly explained that "[t]he critical differences between activities of daily

living and activities in a full-time job are that a person has more flexibility in scheduling the

former than the latter, can get help from other persons . . . and is not held to a minimum standard

of performance, as [he] would be by an employer." *Hughes v. Astrue*, 705 F.3d 276, 278-279 (7th

Cir. 2013) (citations omitted); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). Thus, this court

finds that the Plaintiff's limited daily activities cannot provide the logical bridge to uphold the

ALJ's decision to reject his testimony.

Plaintiff next argues that the ALJ improperly rejected Plaintiff's allegations on the basis

that he did not obtain ongoing treatment for or report his cognitive problems. (R. at 29 : "[t]here

is *no evidence* of any ongoing complaints of or treatment for cognitive issues"; R at 30: "records

do not show *any consistent or ongoing* complaints of memory issues in the last year, suggesting

that it is not as limiting as alleged.") (emphasis added).  Clearly, the ALJ's assertions are either

erroneous or based on a selective discussion of the evidence. Plaintiff presented to the medical

office of Dr. Christopher Ricketts on May 30, 2012 to discuss his "recurrent strokes and

disability." (R. at 450). The Plaintiff reported he was no longer "on CPAP due to cost." *Id.* The

treating physician noted that the Plaintiff "Lost a job due to stroke sx which was in November.

Family hasn't let him drive. Personality is 'flatter affect since his episode in November." *Id*. He

diagnosed "SYMPTOM, ALTERATION OF AWARENESS, TRANSIENT." (R. at 451). From

September 25, 2012 to March 6, 2013, the Plaintiff continued to see Dr. Ricketts for a check ups

and treatment of his "[t]ransient alteration of awareness." (R. at 478-484, 491-493). On March 6,

2013, Dr. Rickets stated that the Plaintiff "has his disability hearing next week so hopefully this

goes favorably for him." (R. at 493). Plaintiff correctly contends that because the record

indisputably contains evidence of ongoing complaints and treatment for the Plaintiff's profound

cognitive deficits, the ALJ's finding to the contrary is not supported by the requisite logical and

accurate bridge which is necessary to enable meaningful review.  Again, this court agrees with the

Plaintiff that the ALJ's adverse credibility determination is "patently wrong" and warrants

remand.

Additionally, the ALJ failed to adequately consider how Dr. Heroldt's opinion

corroborated Plaintiff's allegations and failed to weigh the examiner's opinion in accordance with

20 C.F.R. § 404.1527(c)[6]. Dr. Heroldt wrote:

> Scores on the WMS-IV indicate that the claimant's visual memory is functioning
> well. The scores also indicate that other areas have been affected negatively and
> may affect his adaptive functioning skills. By the claimant's report and that of his
> stepdaughter, the claimant is experiencing memory problems. The claimant has to
> be reminded to take his medication. He has difficulty recalling recent
> conversations and cannot recall words he wants to use in conversations. He
> experienced difficulty when working recalling how to use a machine he used to do
> his work. He forgets names of people he should know and has on occasion
> forgotten his own. He has had difficulty recalling the medical history of his family;

information he once knew.

(R. at 392). The examining physician felt "the claimant is not capable of handling his funds." *Id.*

Taken together, Dr. Heroldt's statements that the Plaintiff's impaired memory "may affect his adaptive functioning skills" and that he should not manage his own finances corroborate his allegations of profound cognitive deficits precluding the performance of even simple work.

Despite mentioning Dr. Heroldt's examination and part of his opinion, the ALJ never expressly weighed his medical source opinion as the Commissioner requires. SSR 96-8p ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted") The Commissioner cannot credibly contend that the ALJ's subsequent invocation of the Plaintiff's daily activities is a logical and accurate basis for disregarding this corroborative medical source opinion based on clinical testing of the Plaintiff's memory deficit. As he did when invoking the Plaintiff's daily activities in other parts of the decision, the ALJ omitted Dr. Heroldt's recognition of the extensive support the Plaintiff needed to perform them. (R. at 28) To the extent the ALJ's citation of the Plaintiff's daily activities can be read as constituting a rationale for discrediting the examiner's opinion, such citation was neither logical nor accurate. Consequently, the ALJ's rejection of the Plaintiff's allegations is patently wrong.

Accordingly, for all the foregoing reasons, this case will be remanded.

<u>Conclusion</u>

Based on the foregoing, this case is REMANDED to the Commissioner for proceedings consistent with this Order.

Entered: August 11, 2015.

s/ William C.  Lee
William C. Lee, Judge
United States District Court